IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 05-cv-01573-CBS

STERLING CONSULTING CORPORATION, a Colorado corporation,
    Plaintiff,
v.

CREDIT MANAGERS ASSOCIATION OF CALIFORNIA, d/b/a/ CMA BUSINESS
CREDIT SERVICES, a California nonprofit corporation;
INDIAN MOTORCYCLE COMPANY, a Delaware corporation;
IMCOA LICENSING AMERICA, INC., a Delaware corporation; and
IMCOA HOLDINGS AMERICA, INC., a Delaware corporation,
    Defendants.

---

MEMORANDUM OPINION AND ORDER

---

Magistrate Judge Craig B. Shaffer

This civil action comes before the court on: (1) Plaintiff Sterling Consulting Corporation's ("Sterling") Motion for Summary Judgment (filed August 4, 2006) (doc. # 89); (2) Credit Managers Association of California's ("CMA") Cross-Motion for Summary Judgment (filed September 1, 2006) (doc. # 97); and (3) Sterling's Motion to Strike and Motion for Default (filed September 20, 2006) (doc. # 102). Pursuant to the "Order Referring Case to Magistrate Judge for Final Disposition" dated September 20, 2006 (doc. # 101), this civil action,

> including all pending motions, is REFERRED for final disposition to
> Magistrate Judge Shaffer, without need for a recommendation to the
> District Court, pursuant to 28 U.S.C. § 636(c) and the consent of the
> parties. Magistrate Judge Shaffer shall conduct any and all proceedings
> in this matter, and order the entry of judgment in the case.

The court has reviewed the pending motions, the responses (filed September 1, 2006,

1

October 5, 2006, and October 10, 2006) (docs. # 98, # 104, and # 106), the replies (filed September 18, 2006 and October 5, 2006) (docs. # 100 and # 105), the entire case file, the exhibits, the arguments presented at the hearing held on October 10, 2006, and the applicable law and is sufficiently advised in the premises.

I.      Cross Motions for Summary Judgment

On August 31, 2000, Sterling, in its capacity as Receiver and in its individual capacity, and the Indian Entities (Indian Motorcycle Company, IMCOA Licensing America, Inc., and IMCOA Holdings America, Inc.), entered into a Settlement Agreement and an Indemnification Agreement.  (*See* Complaint at ¶¶ 10, 12; Exhibits 1 and 2 to doc. # 98 (docs. # 98-2 and # 98-3)).  On or about March 28, 2001, District Judge Weinshienk approved the Settlement and Indemnification Agreements. Pursuant to the Settlement Agreement, Sterling, in its capacity as Receiver and in its individual capacity agreed, *inter alia,* to:

> 3.4.a.  forever refrain from attacking the trademark rights of Indian which are based upon the rights conveyed by the Receiver pursuant to the Purchase Agreement; and
>
> 3.4.b.  forever refrain from consulting, voluntarily cooperating with, or otherwise assisting any person, firm, or corporation, including, without limitation, American Motorcycle Company, from attacking the trademark rights of Indian.

(Settlement Agreement, Exhibit 1 to doc. # 98 (doc. # 98-2) at p. 8).  The Settlement Agreement further provided in pertinent part:

> 5.10   **Assignment**.  The Receiver and Sterling may not assign their obligations hereunder without the prior written consent of Indian.

> Indian may not assign its obligations hereunder without the written
> consent of the Receiver (unless discharged) and Sterling.  This
> Settlement Agreement shall not, in any way, be construed as a limitation
> on Indian's right to assign a Purchased Asset, however, in the event of an
> assignment of all or substantially all of its Class 12 and/or all or
> substantially all of its Class 25 trademark rights in North America
> (comprised of the United States, Canada and Mexico, collectively), or the
> European Union (comprised of all member countries, collectively, as of
> the date of this Agreement), or all or substantially all of the Purchased
> Assets (whether in a single transaction or series of related transactions),
> Indian shall give the Indemnified Parties prior notice of the assignment
> and Indian shall require the assignee thereof to assume the obligations
> hereunder.  An assumption of obligations by the assignee pursuant to this
> section 5.10 shall not, in any way, limit or diminish Indian's obligations.
> Notwithstanding anything herein to the contrary, Indian shall not execute
> an assignment that defeats the intent of this Indemnification.

(Settlement Agreement, Exhibit 1 to doc. # 98 (doc. # 98-2)).  The Indemnification Agreement provided in pertinent part:

> 6.12   **Assignment**.  The Receiver and Sterling may not assign
> their obligations hereunder without the prior written consent of Indian.
> Indian may not assign its obligations hereunder without the written
> consent of the Receiver (unless discharged) and Sterling.  This
> Indemnification Agreement shall not, in any way, be construed as a
> limitation on Indian's right to assign a Purchased Asset, however, in the
> event of an assignment of all or substantially all of its Class 12 and/or all
> of substantially all of its Class 25 trademark rights in North America
> (comprised of the United States, Canada and Mexico, collectively), or the
> European Union (comprised of all member countries, collectively, as of
> the date of this Agreement), or all or substantially all of the Purchased
> Assets (whether in a single transaction or series of related transactions),
> Indian shall give the Indemnified Parties prior notice of the assignment
> and Indian shall require the assignee thereof to assume the obligations
> hereunder.  An assumption of obligations by the assignee pursuant to this
> section 6.12 shall not, in any way, limit or diminish Indian's obligations.
> Notwithstanding anything herein to the contrary, Indian shall not execute
> an assignment that defeats the intent of this Indemnification Agreement.
> Indian may not disclose the terms of this Indemnification Agreement to
> such proposed assignee unless such proposed assignee agrees to hold
> this Indemnification Agreement confidential.

(Indemnification Agreement, Exhibit 2 to doc. # 98 (doc. # 98-3)).

The Indian Entities assigned their Intellectual Property Assets to CMA (as Assignee). CMA commenced marketing the assets in October of 2003. (Complaint at ¶ 15). In June of 2004, CMA sold the Indian Trademark to an affiliate of the Stellican Group ("Stellican"). Stellican did not assume the obligations of the Settlement Agreement or the Indemnification Agreement. CMA concedes:

> [t]here is no dispute that the Intellectual Property Assets were assigned by the assignee without requiring the Purchaser of such assets to assume the obligations under the Indemnification Agreement at issue in Sterling's separate action against the Assignee (Case No. 05-1573).

(*See* Supplemental Status Report filed June 30, 2006 in Case No. 95-cv-00777-REB-CBS (doc. # 2304) at p. 5; *see also* CMA's Response (doc. # 98) at p. 5 ¶ (9)). CMA further concedes that Sterling did not consent to the sale of the Indian Trademark to Stellican without assumption of the obligations under the Settlement and Indemnification Agreements. (*See* CMA's Response (doc. # 98) at p. 5 ¶ (17)). CMA has not conceded any breach of the Agreements.

Sterling seeks a declaratory judgment that the Indian Entities and CMA breached and repudiated the Indemnification and Settlement Agreements, thereby excusing Sterling from future performance under those Agreements. (*See* Complaint at ¶¶ 34, 42; Request for Relief at ¶¶ 1, 2, 4). Sterling alleges that it "has been offered engagements for services which engagements Sterling would be prohibited from undertaking, unless it is relieved from its obligations under the Settlement Agreement." (Sterling's Motion for Summary Judgment at ¶ 16). "The amount of the compensation

from which Sterling has been and will be precluded from earning exceeds Seventy-Five Thousand Dollars ($75,000)."  (Sterling's Motion for Summary Judgment at ¶ 16).

CMA contends that, although Stellican did not assume the obligations under the Settlement and Indemnification Agreements, the purchase does not constitute a material breach of the Agreements.  CMA asserts that no breach of the Settlement or Indemnification Agreements has occurred that would excuse Sterling's performance under the Agreements.

No party claims that the Agreements are ambiguous.  The parties agree that the issue for the court to determine is whether CMA's failure to require Stellican to assume the obligations under the Settlement and Indemnification Agreements constituted a sufficiently material breach to excuse Sterling from its obligations under the Agreements.

II.     Standard of Review

Summary judgment may be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.

> Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.
> To meet the burden of production required to support summary judgment, the movant need only point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law.  Summary judgment will then lie if the movant

>establishes entitlement to judgment as a matter of law given [the] uncontroverted, operative facts. . . . Factual disputes that are irrelevant or unnecessary will not be counted.
>
>Where a movant has met the initial burden required to support summary judgment, the non-movant then must either establish the existence of a triable issue of fact under Fed.R.Civ.P. 56(e) or explain why he cannot . . . under Rule 56(f). Conclusory allegations made by a non-movant will not suffice. Instead, sufficient evidence (pertinent to the material issue) must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein.

*Diaz v. Paul J. Kennedy Law Firm*, 289 F.3d 671, 674-75 (10th Cir. 2002) (citations omitted).

III.  Analysis

A.  Breach of Agreements

The court's analysis is governed by Colorado law. (*See* Settlement Agreement Exhibit 1 to doc. # 98 (doc. # 98-2) at ¶ 5.2; Indemnification Agreement, Exhibit 2 to doc. # 98 (doc. # 98-3) at ¶ 6.2). "Construction of the provisions of a settlement agreement, like any other question of contract construction, is a question of law" for the court. *Carland v. Metropolitan Life Ins. Co.*, 935 F.2d 1114, 1120 (10th Cir. 1991) (citing *Florom v. Elliott Mfg.*, 867 F.2d 570, 575 (10th Cir. 1989)). *See also Alzado v. Blinder, Robinson & Co., Inc.*, 752 P.2d 544, 553 (Colo. 1988) ("As with other contracts, indemnity agreements . . . may be construed in view of all the circumstances surrounding the transaction. . . An indemnity agreement is to be given such a meaning as would be attached to it by a reasonably intelligent person . . . knowing all the circumstances prior to and contemporaneous with the making of the integration")

(citations and internal quotation marks omitted).

"The primary goal of contract interpretation is to determine and give effect to the intent of the parties, and that intent is to be determined primarily from the language of the instrument itself." *CMCB Enterprises, Inc. v. Ferguson*, 114 P.3d 90, 94 (Colo. App. 2005) (citation omitted), *cert. denied*, (Colo. June 27, 2005). "Unless there is an ambiguity in the [contract] language, the [contract] must be enforced as written." *Management Specialists, Inc. v. Northfield Ins. Co.*, 117 P.3d 32, 35 (Colo. App. 2004) (citations omitted). "Under well-settled principles of contract interpretation, the words of the contract should be given their plain meaning according to common usage, and strained constructions should be avoided." *Management Specialists, Inc.*, 117 P.3d at 35 (citation omitted). *See also First Christian Assembly of God, Montbello v. City and County of Denver*, 122 P.3d 1089, 1092 (Colo. App. 2005) ("The meaning and effect of a contract [are] to be determined from a review of the entire instrument, not merely from isolated clauses or phrases") (internal quotation marks and citation omitted). "The overriding rules of contract interpretation require a court to apply the plain meaning of the words used, subject to interpretation from the context and circumstances of the transaction." *First Christian Assembly of God, Montbello*, 122 P.3d at 1092 (citations omitted).

"To prevail on a claim for breach of contract, a party must show that there was a contract in existence and that one party failed to perform some term of the contract." *Spencer Investments, Inc. v. Bohn*, 923 P.2d 140, 144 (Colo. App. 1995) (citation omitted). Whether a party has substantially performed under a contract necessarily

turns on whether that party has materially breached the contract because material breach renders substantial performance impossible. *Interbank Investments, L.L.C. v. Vail Valley*, 12 P.3d 1224, 1228 (Colo. App. 2000).

"The importance or materiality of contract terms must be assessed in context and in light of the expectations of the parties at the time the original contract was formed." *Interbank Investments*, 12 P.3d at 1229 (citation omitted). "A material term goes to the root of the matter or essence of the contract." *Coors v. Security Life of Denver Ins. Co.*, 112 P.3d 59, 64 (Colo. 2005) (citation omitted). "Materiality must be assessed in the context of the expectations of the parties at the time the contract was formed," considering "the importance or seriousness of the breach and the likelihood that the injured party will nonetheless receive substantial performance." *Coors v. Security Life of Denver Ins. Co.*, 112 P.3d at 64.

The terms of the Settlement Agreement provided for:

a)   Settlement of all issues between the Receivership Estate and the Indian Entities, including dismissal of the Indian entities from the Receivership Action and mutual releases. (Settlement Agreement, Exhibit 1 to doc. # 98 (doc. # 98-2) at §§ 2.1.c., 2.9).

b)   A cash payment to the Receiver and Fairfield & Woods, the Receiver's counsel, in the amount of $350,000.00 in full satisfaction of specified obligations as well as "[a]ny and all other obligations past, present, or future to reimburse, compensate, bonus, gift or otherwise pay Sterling or the Receiver for any obligation, claim reimbursement, debt, service, action, office, duty or status whether pursuant to any agreement, written or oral, or any order or any obligation arising at law or in equity whatsoever, except as specifically ser forth in this Settlement Agreement, the Indemnification Agreement, and the Release Agreement. (*Id.* at §§ 2.5.).

c)   Tender of Stock Options both to the Receiver and to Sterling in its

      individual capacity.  (*Id.* at §§ 2.6., 2.7).

      d)      Entry into the Indemnification Agreement.  (*Id.* at §§ 2.8).

      e)      Termination of the "Investigation." (*Id.* at §§ 2.4).

      f)      Agreement by the Receiver and Sterling to "forever refrain from attacking the Trademark rights of Indian . . . or otherwise assisting any person, firm, or corporation . . . from attacking the trademark rights of Indian." (*Id.* at §§ 3.4).

Sterling does not contest that these obligations under the Settlement Agreement were performed following approval by the court on or about March 28, 2001.  The Indian Entities were dismissed from the Receivership Estate, the $350,000.00 cash payment was made, the Stock Options were tendered to the Receiver and to Sterling in its individual capacity, the Indemnification Agreement was executed, the "Investigation" was terminated, and the Receiver and Sterling have so far refrained from attacking the trademark rights of Indian.  There are no unperformed obligations remaining under the Settlement Agreement.

      Based upon the express language of the Indemnification Agreement, the intent of the parties was to address Sterling's concern, as Receiver,

> regarding its possible continuing participation in certain ongoing litigation involving Indian which the parties hereto expect may continue past the closing of the Receivership and also regarding future claims that may be brought against Indian, the Receiver, related parties, or some or all of them.

(*See* Indemnification Agreement, Exhibit 2 to doc. # 98 (doc. # 98-3) at pp. 1-2, Recital F).

> In an effort to resolve these concerns, expedite the dismissal of Indian from the Receivership Action, and expedite the termination of the

9

>Receivership Action, the parties hereto enter into this Indemnification Agreement.

(*See* Indemnification Agreement, Exhibit 2 to doc. # 98 (doc. # 98-3) at p. 2, Recital G). The Indemnification Agreement provided that Sterling would be indemnified with respect to certain specified Claim Losses (*see* Indemnification Agreement, Exhibit 2 to doc. # 98 (doc. # 98-3) at § 1.1c) through the term of the Indemnification Agreement. No Claims were submitted to CMA or the Indian Entities. Sterling does not contend that there are any unpaid Claim Losses. The Indemnification Agreement expired by its own terms on December 31, 2005. (*See* Indemnification Agreement, Exhibit 2 to doc. # 98 (doc. # 98-3) at § 2.1.). Thus, CMA was not in default of its essential obligations under the Indemnification Agreement.

The Agreements obligated "*Indian*" to "give the Indemnified Parties prior notice of the assignment" and to "require the assignees thereof to the assume the obligations hereunder." (*See* Exhibit 1 to doc. # 98 (doc. # 98-2) at § 5.10; Exhibit 2 to doc. # 98 (doc. # 98-2) at § 6.12) (emphasis added). As assignee of Indian, CMA assumed the obligations under the Indemnification Agreement. Neither of the Agreements expressly obligated CMA to require future assignees to assume the obligations under the Agreements.

The purpose and intent of the Agreements were substantially performed. Stellican's failure to assume the obligations under the Settlement and Indemnification Agreements was not a material breach of the Agreements. As the court does not find a material breach, the court does not reach Sterling's argument that a breach excuses

Sterling from its obligations under the Agreements.

B.      Anticipatory Breach by Repudiation

Sterling further argues that CMA's failure to require Stellican to assume the obligations under the Settlement and Indemnification Agreements was an anticipatory breach by repudiation. Sterling argues that "[t]he assignment of the Trademark by CMA to Stellican clearly constituted an act in direct, willful and conscious contravention of the prohibition against transfers of the Trademark without contemporaneous assignment and assumption of the Settlement Agreement and Indemnification Agreement by the assignee." (Sterling's Motion for Summary Judgment at p. 13). Sterling asserts that "CMA knew that those prohibitions were of substantial value to Sterling" and that CMA's breach "removed any incentive for Stellican . . . to honor the future obligations under the Settlement Agreement." (Sterling's Motion for Summary Judgment at pp. 12-13). Thus, Sterling argues, CMA's actions constituted anticipatory breach by repudiation.

"The disclaimer of a contractual duty is a breach of contract even if the time specified in the contract for performing the duty has not yet arrived." *Wisconsin Power & Light Co. v. Century Indem. Co.*, 130 F.3d 787, 793 (7th Cir. 1997). "It is what is called anticipatory breach." *Wisconsin Power & Light Co.*, 130 F.3d at 793 (citations omitted). Colorado has recognized the doctrine of anticipatory breach. *See, e.g., Johnson v. Benson*, 725 P.2d 21, 25 (Colo. App. 1986) ("In order to constitute an anticipatory breach of contract there must be a definite and unequivocal manifestation

11

of intention on the part of the repudiator that he will not render the promised performance when the time fixed for it in the contract arises") (quoting 4 A. Corbin, Contracts § 973 (1951)); CJI-Civ 4th 30:8.

"[A]n anticipatory breach or anticipatory repudiation "centers upon an overt communication of intention or an action which . . . demonstrates a clear determination not to continue with performance." *Albright v. McDermond*, 14 P.3d 318, 324 (Colo. 2000) (quoting C.R.S. § 4-2-610). *See also Lake Durango Water Co. v. Pub. Utils. Com'n*, 67 P.3d 12, 21 (Colo. 2003) (a repudiation of a contract must consist of a present, positive, unequivocal refusal to perform the contract, not a mere threat to abandon its obligations under the contract). "The repudiation must be absolute or unequivocal." *Combs v. International Ins. Co.*, 354 F.3d 568, 599 (6th Cir. 2004) (citing, *inter alia*, *Thunder Basin Coal Co. v. Southwestern Pub. Serv. Co.*, 104 F.3d 1205, 1213 (10th Cir. 1997)). "Courts determine whether anticipatory repudiation has occurred on a case-by-case basis, depending on the particular contract language involved." *Combs*, 354 F.3d at 599 (citations omitted).

At the time the Agreements were entered, the parties' obligations thereunder remained to be performed. Sterling fails to identify any unequivocal refusal by CMA to perform under the Settlement or Indemnification Agreements. The evidence does not support Sterling's allegation that CMA repudiated the contract. *See, e.g.,* Exhibits C and D to doc. # 98 (doc. # 98-4). The court has determined that the Agreements were substantially performed. The assignment by CMA to Stellican did not constitute anticipatory breach by repudiation.

IV.   Sterling's Motion to Strike and for Default

Sterling argues that CMA as Assignee was not named as a defendant or served as a party in this lawsuit and that CMA in its individual corporate capacity has not answered or otherwise appeared in this civil action. Thus, Sterling argues, all pleadings filed by CMA as Assignee on behalf of the Indian Entities should be stricken. The court disagrees.

On May 12, 2004, the Indian Entities executed General Assignments with CMA as assignee, for the benefit of the Indian Entities' creditors. (*See* Exhibits B, C, and D to doc. # 102). The General Assignments provide that:

> Any contract, liability, or obligation made by Assignee in connection with the administration of this Agreement shall not personally bind Assignee or any of its officers, agents, or employees, but it shall obligate Assignee in its capacity as Assignee only, whether or not he contract specifically so provides. Assignee hereunder shall be liable only in its official capacity for reasonable care and diligence in administering the estate created by this assignment.

(Exhibits B, C, and D to doc. # 102). Sterling initiated this civil action and CMA as Assignee on behalf of the Indian Entities accepted service. (Exhibit A to doc. # 104 (doc. # 104-2)).

Sterling first argues that, under California law, CMA does not exist as a statutory assignee pursuant to the Assignments for Benefit of Creditors. "An assignment for benefit of creditors is a business liquidation device available to an insolvent debtor as an alternative to formal bankruptcy proceedings." *Credit Managers Assn. v. National Independent Business Alliance*, 162 Cal. App. 3d 1166, 1169 ((Cal. App. 2. Dist. 1984) (citation omitted). "CMA is a non-profit association of credit managers that operates as

a third party fiduciary for the administration of assignments for the benefit of creditors ("ABC") under California state law."  (Exhibit C to doc. # 104 (doc. # 104-2) at p. 2).

"For a period of time in California, both the common law type and a statutory alternative type of such assignment existed at the same time."  *Credit Managers Assn.*, 162 Cal. App. 3d at 1169.

> Sections 3449 to 3473 inclusive, of the Civil Code provided a statutory method of making an assignment for benefit of creditors. Section 3448 of that code provided that the common law assignment for benefit of creditors is expressly recognized and that the statutory method is strictly an alternative to the common law method and is not to be construed as preventing or invalidating a common law assignment. The statutory provisions for this alternative method of making an assignment for benefit of creditors were repealed by Statutes 1980, chapter 35, section 3, page 313. Thereafter common law assignments are to be used exclusively.

*Credit Managers Assn.*, 162 Cal. App. 3d at 1170 (citation omitted).

"Under the common law of assignments, the assignee stands in the place of the assignor, and can assert no claim to property which the assignor might not. The assignment, therefore, does not carry with it to the trustee the title to property which the assignor has previously transferred in fraud of his creditors, for the purpose of hindering, delaying, and defrauding them."  *Credit Managers Assn.*, 162 Cal. App. 3d at 1170 (internal quotation marks and citations omitted).  "[Y]et the assignee had the right to resist a fraudulent claim against property in his hands, . . ."  *Credit Managers Assn.*, 162 Cal. App. 3d at 1170.  "It is the duty of the assignee in the performance of his trust to defend this property against all unjust adverse claims. He takes the property, not as a purchaser, but subject to all rights and equities subsisting against it in favor of third parties, and in that sense he is said to succeed only to the rights of his assignor."

*Credit Managers Assn.*, 162 Cal. App. 3d at 1170-71.  Here, as the legal representative of the assignors, CMA was charged with the duty to defend the property in its hands against all unjust adverse claims.  *See Credit Managers Assn.*, 162 Cal. App. 3d at 1172.  (*See also* General Assignments (Exhibits B, C, and D to doc. # 102)).

Sterling next argues that CMA in its individual corporate capacity is in default.  However, CMA in its individual corporate capacity has not been served and is not a party in the lawsuit.  (*See* Exhibit A to doc. # 104 (doc. # 104-2)).  The only relationship between CMA and the Indian Entities is CMA's capacity as an assignee for the administration of assignments for the benefit of creditors.  The assignee's own assets are not the subject of this lawsuit.  *See* General Assignments (Exhibits B, C, and D to doc. # 102) ("Any contract, liability, or obligation made by Assignee in connection with the administration of this agreement shall not personally bind Assignee or any of its officers, agents, or employees, but it shall obligate Assignee in its capacity as Assignee only, . . .").

Sterling's Motion to Strike and for Default is properly denied.

Accordingly, IT IS ORDERED that:

1.    Sterling's Motion to Strike and Motion for Default (filed September 20, 2006) (doc. # 102) is DENIED.

2.    Plaintiff Sterling Consulting Corporation's ("Sterling") Motion for Summary Judgment (filed August 4, 2006) (doc. # 89) is DENIED.

3.    Credit Managers Association of California's ("CMA") Cross-Motion for

Summary Judgment (filed September 1, 2006) (doc. # 97) is GRANTED.

4. Judgment on the Complaint shall enter in favor of Defendants and against Plaintiff.

Dated at Denver, Colorado this 12th day of December, 2006.

BY THE COURT

*s/Craig B. Shaffer*
United States Magistrate Judge